IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

  v.                                                                CRIMINAL NO. 1:22-CR-45
                                                                                     (KLEEH)

**JEREMY JENKINS,**

      **Defendant.**

**MEMORANDUM OPINION AND ORDER
GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Pending before the Court is a motion to suppress filed by Defendant Jeremy Jenkins ("Defendant"). For the reasons discussed herein, the Court **GRANTS** the motion.

      **I.    PROCEDURAL BACKGROUND**

On July 6, 2022, the grand jury returned a two-count indictment, charging Defendant with two counts of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The methamphetamine forming the basis of Count One was seized during a traffic stop on January 29, 2021. Defendant filed a motion to suppress that evidence. It is fully briefed and ripe for review. The Court convened a hearing on the motion on January 18, 2023, and after the hearing, the parties submitted supplemental briefs.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

## II.   FACTS

On January 29, 2021, Deputy Tyler Gordon with the Harrison County Sheriff's Department conducted a traffic stop on a truck being driven by Defendant.  The parties agree that the initiation of the traffic stop was lawful.  They also agree that Deputy Gordon had reasonable suspicion to believe that Defendant was armed, and a protective pat-down was justified.  They disagree as to whether Deputy Gordon's pat-down of Defendant was lawfully conducted. Therefore, the Court's recitation of facts will focus on the pat-down itself.  The Court finds the following facts based on the testimony and arguments at the suppression hearing; all exhibits to the hearing, including Deputy Gordon's body camera footage; and the briefs filed by the parties.

During the traffic stop, Deputy Gordon asked Defendant to exit the vehicle and step towards its rear, and Defendant complied. Deputy Gordon told Defendant that he was going to pat him down for weapons.  He directed Defendant to face the vehicle and place his hands on top of his head, and Defendant complied.  Deputy Gordon then began to pat him down and directed him to spread his legs, which he did.  When Deputy Gordon moved to Defendant's left leg, he patted Defendant's left pants pocket, squeezed the pocket, and immediately opened the pocket.  He pulled out a baggie containing

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

white powder.[1]  He then handcuffed Defendant and continued to search him.

The Government's position is that Deputy Gordon saw the baggie sticking out of Defendant's pocket before he opened the pocket, and Deputy Gordon testified to the same:

> When I went around to the left side, I patted that left pocket, and I saw the corner of what appeared to be a pretty large baggy, and it had white residue.  I could see down into the pocket.  At that point, I grabbed onto it.  I knew through my training and experience that it was a baggy of something most likely crystal-like.  And I removed it at that time.
>
> . . .
>
> I could see just the corner.  I couldn't see a lot of it.  But I could see enough of a -- what I knew was a bag, a plastic bag, that had what appeared to be residue of some sort.

Transcript, ECF No. 48, at 15:5-10; 31:13-15.

Deputy Gordon's testimony was, however, inconsistent at times.  For instance, he also testified on cross examination that after he patted Defendant's pocket, he looked inside the pocket "to determine what it was":

> Q.  So to determine what it was, you looked first.
>
> A.  Correct.

Id. at 29:15-16.  This differed from his testimony on redirect:

---

[1] It was ultimately determined that the baggie contained methamphetamine.

> Q. So when you opened the pocket further, to reach into the pocket and see if there was anything else in there that could hurt you, was that because you had already made that determination that you knew what that bag in the pocket was?
>
> A. Yes.

Id. at 34:21-25.

In contrast to Deputy Gordon's testimony, his body camera footage shows that Defendant's pocket was closed. On video, Deputy Gordon pats the closed pocket, squeezes it, and quickly pries it open. The video shows no gap through which a baggie is visible. Deputy Gordon likewise conceded that the body camera video does not depict anything "hanging out" of Defendant's left pocket. Id. at 29:21-24. The Court acknowledges that the body camera, which was attached to Deputy Gordon's left shoulder, would not have a view of Defendant's pocket that was identical to Deputy Gordon's view. For this reason, the Court does not find that the body camera footage "clearly contradicts" Deputy Gordon's testimony about seeing the baggie. See United States v. Miller, 54 F.4th 219, 229 (4th Cir. 2022) ("[W]hen an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements."). It is possible that while Deputy Gordon could see into Defendant's pocket, the body camera could not. The video footage does, however, make Deputy Gordon's

testimony less persuasive.

Defendant testified that his pocket was closed during the pat-down. He testified that he had an unobstructed view of his pocket at that time. Id. at 39:5-40:1. Defendant was wearing large, cargo-style overalls with deep pockets. Id. at 9:20; 37:7-21. They were "work pants for outside weather." Id. at 37:11. In the six years Defendant had owned the pants, he never experienced his pants sagging open or items falling out of his pockets. Id. 37:22-38:19.

Based on the body camera footage, Defendant's testimony, and the inconsistencies in Deputy Gordon's testimony, the Court finds that Deputy Gordon's testimony about his view of the baggie is not credible. The Court finds that Deputy Gordon did not know Defendant had contraband in his pocket until he opened the pocket and pulled out the baggie. The record provides no indication as to what Deputy Gordon believed Defendant had in his pocket after the "pat and squeeze." See id. at 28:16-19. There is likewise no indication in the record that Deputy Gordon had any information, belief, or suspicion that Defendant was at the time or had been involved previously in either drug use or distribution.[2] Again,

---

[2] The only information relevant to the Terry stop and frisk Deputy Gordon received was that Defendant had previously been armed during interaction with law enforcement.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

considering the entire record, Deputy Gordon's testimony that he saw a bag with white residue before he opened Defendant's pocket is unpersuasive.

After finding the baggie, Deputy Gordon handcuffed Defendant and continued to search him. Another officer walked a narcotics dog up to Defendant's truck. The dog did what Deputy Gordon described to be a passive alert to the presence of drugs. The officers then sporadically searched certain parts of Defendant's truck as they waited for Defendant's father to arrive and take Defendant's belongings (and his dog) with him. After some time, Deputy Gordon drove Defendant to the police station.

### III. DISCUSSION

In Terry v. Ohio, the Supreme Court held that during a traffic stop, if an officer reasonably believes that an individual may be "armed and dangerous," the officer is entitled to frisk the individual for weapons. 392 U.S. 1, 27 (1968). A Terry frisk "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Terry, 392 U.S. at 26). The scope of the search must be "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. "If the protective search goes beyond what is

necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." Dickerson, 508 U.S. at 373 (citing Sibron v. New York, 392 U.S. 40, 65-66 (1968)).  "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." Terry, 392 U.S. at 18 (citations omitted).

The plain-view doctrine applies during a Terry frisk: "[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Dickerson, 508 U.S. at 375 (citations omitted).  The plain-view doctrine does not apply, however, if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object"; in other words, it does not apply if the object's "incriminating character is not immediately apparent." Id. (quotations and citations omitted).

In Dickerson, the Supreme Court announced that the plain-feel doctrine also applies during a Terry frisk.  See id. (extending the plain-view doctrine's application to "cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search").  The Dickerson Court explained,

> If a police officer lawfully pats down a

> suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

Id. at 375-76. However, "[o]nce an officer has determined that the object is not a weapon, . . . and its shape or size does not indicate its contraband nature, the search must stop." United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998).

The plain-feel doctrine "does not require absolute certainty that the object is contraband." United States v. Jones, 303 F. Supp. 2d 702, 706 (D. Md. 2004). "To the contrary, the plain feel doctrine, like the plain view doctrine, only requires that the officer have probable cause to believe that the object is contraband by the time he realizes it is not a weapon." Id. (citations omitted). At the other end of the spectrum, the officer is not allowed to determine if an item is contraband by "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket[.]" Dickerson, 508 U.S. at 378 (disapproving of officer who engaged in this behavior after he already knew that the item in the defendant's pocket was not a weapon).

**A.   Deputy Gordon exceeded the scope of the protective pat-down because he opened Defendant's pocket before determining that it contained contraband.**

Deputy Gordon testified that he could see the baggie sticking out of Defendant's pocket before he opened the pocket. In other words, he claims that the baggie was in plain view. As discussed, however, the Court has found that Deputy Gordon did not see the baggie before opening Defendant's pocket. To determine that Defendant's pocket contained contraband, Deputy Gordon opened the pocket and did a "further search." See Dickerson, 508 U.S. at 375. The baggie was not in plain view. Further, Deputy Gordon never testified that he knew from his patting alone that Defendant had contraband in his pocket, so the plain-feel doctrine does not apply.

Having found that neither the plain-view nor the plain-feel doctrine applies, the Court is compelled to find that Deputy Gordon engaged in a "continued exploration of [Defendant's] pocket after having concluded that it contained no weapon," which was unrelated to the sole justification of the Terry search in the first place. See id. at 378. Deputy Gordon did not determine that there was contraband in Defendant's pocket until he opened the pocket. This additional exploration was not authorized under Terry or any other exception to the warrant requirement. As such, Deputy Gordon exceeded the scope of his Terry search.

> **B.   The inevitable-discovery doctrine does not apply because the Government has produced no evidence of the narcotics dog's reliability.**

The inevitable-discovery doctrine "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (citations omitted). The prosecution must prove by a preponderance of the evidence that (1) the police legally could have uncovered the evidence, and (2) the police would have done so. United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1988). The Government has not met its burden here.

It is well-established that "[t]he detection of narcotics by a trained dog is generally sufficient to establish probable cause." United States v. Robinson, 707 F.2d 811, 815 (4th Cir. 1983) (citations omitted). "[I]mplicit" in that principle, however, is the "assumption that a drug dog's positive alert for contraband must possess some indicia of reliability for the alert to establish probable cause." United States v. Koon Chung Wu, 217 F. App'x 240, 245 (4th Cir. 2007). Noting that its sister circuits had established certain reliability requirements pertaining to narcotics dogs, the United States Court of Appeals for the Fourth Circuit has "assum[ed] that evidence of a drug dog's training and

certification is needed to establish the dog's reliability[.]"

Id. As the Supreme Court has explained,

> If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence.

Florida v. Harris, 568 U.S. 237, 248 (2013).

Here, the Government argues that the narcotics dog's positive alert, because it established probable cause to search, makes it inevitable that the Government would have found the methamphetamine forming the basis of Count One of the Indictment. The Government, however, has introduced no evidence with respect to the dog's training and certification. The only testimony regarding the narcotics dog was as follows:

> BY MS. CONKLIN:
>
> Q. I see another police officer that has walked into the video. Who is that?
>
> A. He is now a sergeant, but at the time he was Deputy Harris with our office. He's a K9 handler.
>
> Q. Okay. And had you called a K9 out to respond to the scene?
>
> A. Yes, ma'am.
>
> MS. CONKLIN: Okay. If we could restart the

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTION TO SUPPRESS [ECF NO. 38]

video.

(Government's Exhibit Number 1 resumes.)

MS. CONKLIN: We can pause it here.

BY MS. CONKLIN:

Q. At 4:31:27 I see -- is that the same person, who's now a sergeant, back with his dog?

A. Yes, ma'am.

Q. Okay.  And does the dog, at this point, go to conduct a search of the vehicle -- or a sniff of the vehicle, I should say?

A. Open air -- open air sniff I believe is the term.

MS. CONKLIN: Okay. If we could play again.

(Government's Exhibit Number 1 resumes.)

MS. CONKLIN: And if we can pause it there. That is 4:32- -- or 4:32:00Z, I believe.  And that's approximately 4 minutes [sic] and 22 seconds into the stop.

BY MS. CONKLIN:

Q. Did you observe the dog do a sniff of the vehicle?

A. Yes.

Q. And did the dog alert to the possible presence of drugs?

A. According to Deputy Harris, yes.

Q. Okay.  And did you witness the dog alert?

A. I'm not his handler, but I believe that's his alert, his --

>   Q. Have you --
>
>   A. -- his passive alert.
>
>   Q. I was going to say, have you seen him passive alert to other scenes as well?
>
>   A. Yes, ma'am.
>
>   Q. Okay. Given the dog's passive alert to the vehicle, would you believe you had probable cause to search the vehicle and the people in the vehicle at that point as well?
>
>   A. Yes, ma'am.

Transcript, ECF No. 48, at 16:20-18:9. Deputy Gordon, who was not the dog's handler, did not testify about the dog's training or certification. The Government did not separately submit any evidence of the same. There is no evidentiary basis — not even a weak one — from which the Court can conclude that the dog's positive alert was reliable. Without any indicia of reliability, the dog's positive alert did not create probable cause to search. The search of the vehicle was unconstitutional, as would have been any search of Defendant's person that stemmed from the narcotics dog's alert.

   While it is undisputed that Defendant committed several offenses for which he could have been arrested, the Government has not established that it would have arrested him. This forecloses any argument that a search incident to arrest or an inventory

search were inevitable. For these reasons, the Government has not met its burden, and the inevitable-discovery doctrine does not apply.

### C. Application of the exclusionary rule here would promote deterrence and outweighs the cost of excluding the evidence.

Having found the search unconstitutional, the Court must also assess whether application of the exclusionary rule is warranted under the specific circumstances of this case. The Supreme Court created the exclusionary rule "to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." Arizona v. Evans, 514 U.S. 1, 10 (1995). The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights," Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 359 (1998), but the "sole purpose" of the rule "is to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236-37 (2011), and its application "properly has been restricted to those situations in which its remedial purpose is effectively advanced." Illinois v. Krull, 480 U.S. 340, 347 (1987). As the Supreme Court has made clear, the exclusionary rule is not a "strict-liability regime," Davis, 564 U.S. at 240, and exclusion of evidence has "always been [the] last resort, not [the] first impulse." Hudson v. Michigan, 547 U.S. 586, 591

(2006).

As Judge Keeley observed,

> The exclusionary rule is a drastic remedy that exacts a high social cost. See Nix v. Williams, 467 U.S. 431, 442 (1984); Rakas v. Illinois, 439 U.S. 128, 137 (1978) (recognizing that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights."). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free — something that 'offends basic concepts of the criminal justice system.'" Herring v. U.S., 555 U.S. 135, 141 (2009) (quoting Leon, 468 U.S. at 908). Consequently, defendants seeking to invoke the exclusionary rule face a "high obstacle" due to "the rule's costly toll upon truth-seeking and law enforcement objectives." Id. (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364–65 (1998)). The paramount purpose of the exclusionary rule is deterrence; ultimately, courts should only apply the exclusionary rule when "the benefits of deterrence [ ] outweigh the costs." Id. (citing Leon, 468 U.S. at 910).

United States v. Lough, 221 F. Supp. 3d 770, 780 (N.D.W. Va. 2016), aff'd, 721 F. App'x 291 (4th Cir. 2018). "Exclusion exacts a heavy toll on both the judicial system and society at large" because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." Davis, 564 U.S. at 237.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

For the exclusionary rule "to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Id. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." Id. at 240 (citation and internal punctuation omitted). Therefore, the exclusionary rule is applicable "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, [and] the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238 (citations and internal punctuation omitted).

However, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. at 238 (citations and internal punctuation omitted). The "pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers," and the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Herring, 555 U.S. at 145 (internal punctuation omitted).

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

Critically, in the Fourth Circuit, the "flagrancy of police misconduct" is a determinative factor in analyzing the propriety of applying the exclusionary rule. Lough, 221 F. Supp. 3d at 782 (quoting United States v. Davis, 690 F.3d 226, 251 (4th Cir. 2012)). "[T]he deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then. The pertinent inquiry is whether we apply the exclusionary rule to keep similar violations from happening again . . . ." Davis, 690 F.3d at 253. "[T]he general good-faith inquiry . . . requires consideration of whether a reasonably well-trained officer would have known that a search was illegal in light of all of the circumstances." United States v. Stephens, 764 F.3d 327, 337 (4th Cir. 2014) (citation omitted).

At the time Deputy Gordon pulled Defendant's pocket open to continue or expand his warrantless search, he had no probable cause, via either plain-view or plain-feel, to believe the item he "patted and squeezed" was either a weapon or contraband. He pulled the pocket open and removed the contents nonetheless — despite the fact that a drug-sniffing dog was available to assist in potentially establishing probable cause for a more thorough search, and despite Deputy Gordon's authority to arrest Defendant for then-known offenses, which would have enabled him to conduct a search incident to arrest.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

The act of pulling open a pocket seems trivial and insufficient to warrant application of the exclusionary rule, but that innocuous act was undertaken without any constitutional basis. A well-trained officer investigating within the confines of that training would certainly know that manipulating a citizen's clothing during a Terry frisk to extract unidentified items from a pants pocket stretches the scope of such a search too far for the Fourth Amendment to bear. This is neither a novel nor disputed tenet of search and seizure jurisprudence. Law enforcement may not so invade the personal space of citizens, even those under reasonable suspicion of unlawful conduct to justify a Terry stop and frisk, without some constitutional basis. Deterring such investigatory tactics is worth the cost of excluding evidence here.

### IV. CONCLUSION

For the reasons discussed above, the methamphetamine on Defendant's person was unconstitutionally seized, and the motion to suppress is **GRANTED** [ECF No. 38].

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Memorandum Opinion and Order to counsel of record.

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO SUPPRESS [ECF NO. 38]**

DATED: April 28, 2023

*/s/ Thomas S. Kleeh*
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA